CITY OF DETROIT v WALKER

Docket Nos. 96594-96599. Argued April 6, 1994 (Calendar No. 8). Decided July 26, 1994.

The City of Detroit brought separate in personam actions in the Wayne Circuit Court against R. Terry Walker and five other real property owners, seeking to collect delinquent property taxes pursuant to the General Property Tax Act, 1988 PA 202, MCL 211.47; MSA 7.91. The court, Richard Kaufman, J., consolidated the cases and granted summary disposition for the defendants, finding, pursuant to *Joy Management Co v Detroit,* 176 Mich App 722 (1989), that the city charter precluded the use of any method of tax collection other than foreclosure of real property. The Court of Appeals, SULLIVAN, P.J., and JANSEN and R. R. LAMB, JJ., affirmed in an unpublished opinion per curiam, holding that the city's sole means of collecting delinquent real property taxes was by lien and foreclosure (Docket Nos. 129624-129629). The city appeals.

In an opinion by Justice MALLETT, joined by Chief Justice CAVANAGH, and Justices BRICKLEY and BOYLE, the Supreme Court *held:*

The Detroit City Charter expressly incorporates by reference future powers and rights as may be granted by the Legislature. Statutes that provide new procedures or methods for collecting unpaid real property taxes are applicable retroactively.

1. The home rule cities act specifically directs the City of Detroit and other home rule cities to enact charters recognizing the power to levy taxes. Case law provides that home rule cities have power to make all reasonable provisions for the collection of such taxes. Const 1963, art 7, §§ 22 and 34 make clear that home rule cities enjoy not only those powers specifically granted, but they also may exercise all powers not expressly denied. They are empowered to form for themselves a plan of government suited to their unique needs and, upon local matters, exercise the right of self-governance. The municipal gover-

REFERENCES
Am Jur 2d, State and Local Taxation § 875.
See ALR Index under Taxes.

nance system has matured to one of general grant of rights and powers, subject only to certain enumerated restrictions.

2. The Detroit City Charter, art 8, § 8-403, plainly and unambiguously declares that state law regarding property tax collection applies unless the charter provides otherwise. The charter was amended to allow the maintenance of personal actions against delinquent real property taxpayers. When an amendment is enacted soon after controversies arise regarding the meaning of the original act, it is logical to regard the amendment as an interpretation of the original act. The ratification of the amendment clarifies the drafters' and ratifiers' intent to incorporate by reference the tax collection remedies afforded by the General Property Tax Act and all future amendments of the act, including 1988 PA 202.

3. A vested right is an interest that the government is compelled to recognize and protect of which the holder cannot be deprived without injustice. When determining whether a right is vested, policy considerations, rather than inflexible definitions, must control, and consideration is to be given regarding whether the holder possesses what amounts to a title interest in the right asserted. Allowing an in personam action to collect delinquent real property taxes does not change the character of the tax because the amount of the tax is not altered. The tax is a debt a defendant elected not to pay.

4. 1988 PA 202 is a procedural device to secure taxes owed. The defendants are not being taxed as a result of voluntary activities they might have forgone had they been aware of the tax. Rather, had they elected to forgo the activities at issue, namely, refusing to pay the taxes, they would now be in the same position—paying their taxes. There is no vested right in any particular procedure or remedy, and thus the defendants have no right in the continuance of pre-1988 procedures that compels protection.

5. 1988 PA 202 did not create, enlarge, diminish, or destroy contractual or vested rights. Rather, it implemented an additional enforcement mechanism that the city may use to effect its preexisting constitutional and statutory right to assess and collect city property taxes. Because the procedure relates only to tax collection remedies or procedures, it does not fall within the general rule against retrospective operation. Although it is remedial, its retroactive reach is limited as a personal action by the general six-year limitation period of MCL 600.5813; MSA 27A.5813.

Reversed and remanded.

Justice RILEY, joined by Justices LEVIN and GRIFFIN, dissent-

ing, stated that changes in the method of tax collection that alter the nature of collection from an in rem to an in personam action are unconstitutional to the extent that they apply retroactively, i.e., to taxes previously assessed. Statutes governing the collection of taxes are to be strictly construed in favor of the taxpayer. The 1974 Detroit City Charter provisions at issue are ambiguous regarding whether the charter provides for, or even preserves the right to utilize, methods of tax collection other than the judicial sale method provided in § 8-403. The clear intent of the charter's ratifiers was to limit the method of tax collection to the judicial sale.

Generally, property taxes burden the property assessed, but do not constitute personal debts. Thus, absent a specific provision by the taxing legislature, no personal action will lie against a delinquent taxpayer. Tax laws are to be strictly construed, with ambiguities decided in favor of the taxpayer. Statutes creating tax liens may not be enlarged by construction. The method of collection prescribed generally is exclusive.

The procedure for tax collection in § 8-403 is in the nature of an in rem proceeding. Although the amendments of MCL 211.47; MSA 7.91 by 1987 PA 177 and 1988 PA 202 permit the filing of in personam actions against delinquent taxpayers, because retroactive application was not specifically provided, application must be presumed to have been prospective. Further, neither the home rule cities act nor case law addressing this issue permits retroactive application. Thus, the plaintiff is precluded from bringing an·in personam action against property owners for the payment of delinquent property taxes for the time periods at issue under the doctrine of stare decisis.

The recitation in the charter of a single sale mechanism, and the exclusion of other methods of tax collection permitted by state law, activates the "except as otherwise provided" language in § 8-403's reservation-of-rights clause. Therefore, the generalized reservation of rights in this context was nullified. In addition, the comments to § 8-403 manifest a singular intent with respect to the tax collection provisions: the limitation of powers otherwise permitted under state law. Thus, the reservation-of-rights clauses of the charter do not permit retroactive application of the in personam action.

A state may impose a tax only if it is expressly authorized by law. The authority to tax may not be inferred or extended by implication. A specific remedy provided as the proper method of tax collection precludes the use of any other collection method unless specifically provided for. Changing the nature of tax collection from in rem to in personam affects substantive

rights. Despite the existence of several reservation-of-rights clauses, the charter provides for a single method of collection and obligates courts to construe it as the exclusive method. The plaintiff is entitled to collect delinquent taxes through a personal action only for taxes assessed after the 1991 amendment of the city charter.

TAXATION — GENERAL PROPERTY TAX ACT — METHOD OF COLLECTING UNPAID TAXES — RETROACTIVE APPLICATION.

Statutes that provide new procedures or methods for collecting unpaid real property taxes for home rule cities are applicable retroactively (1988 PA 202, MCL 211.47; MSA 7.91).

City of Detroit Law Department (by *Joanne D. Stafford*) for the plaintiff.

*Mager, Monahan, Donaldson & Alber, P.C.* (by *Lawrence M. Scott*), for defendants Walker and Anderson.

*Rubenstein, Plotkin, P.C.* (by *Edward L. Haroutunian* and *Casimir J. Swastek*), for defendant Estate of Almas.

MALLETT, J. We granted leave in these consolidated cases to resolve two questions: (1) whether the 1974 Detroit City Charter incorporates by reference provisions of state statutory law, specifically the 1988 amendment of the General Property Tax Act, 1988 PA 202, MCL 211.47; MSA 7.91, that authorizes local governments to collect delinquent real property taxes by suing a taxpayer individually, and (2) assuming the city may utilize the in personam tax collection provisions contained in the General Property Tax Act to collect delinquent real property taxes, whether 1988 PA 202 may be retroactively applied.

We reverse the decision of the Court of Appeals and find that § 8-403 of the Detroit City Charter expressly incorporates by reference future powers and rights as may be granted by the Michigan

Legislature. We further hold that state statutes that provide new procedures or methods for collecting unpaid real property taxes are retroactively applicable. Consequently, we remand this case to the trial court for proceedings consistent with this opinion.

I

This matter involves six consolidated tax collection suits initiated in 1989 by the plaintiff-appellant City of Detroit, to collect delinquent real property taxes owed by the defendants-appellees R. Terry Walker, Curtis Anderson, Superior Investment and Rental Corporation, Total Investment Company, Charles Smith, and Kenneth Almas, personally and as personal representative of the estate of Victor Almas.[1] The City of Detroit attempted to collect the debts by filing in personam lawsuits against the delinquent taxpayers, a remedy authorized by a 1988 amendment of the General Property Tax Act.[2]

On motion by the delinquent taxpayers, the trial court granted summary judgment in their favor. The trial court accepted the defendants' argument that pursuant to the holding in *Joy Management Co v Detroit,* 176 Mich App 722; 440 NW2d 654 (1989), the city was precluded by the provisions of the city charter from using any method of tax collection, other than the real property foreclosure method contained in art 8, § 8-403(6).[3] A unani-

---

[1] The only appellees before us are Walker, Anderson, and Almas. Superior Investment and Rental Corporation and Charles Smith elected not to appear at the appellate level. Total Investment Company settled with the city.

[2] See 1988 PA 202, MCL 211.47; MSA 7.91.

[3] In relevant part, before its 1991 amendment, § 8-403, Collection of property taxes, of the Detroit City Charter, provided as follows:

mous panel of the Court of Appeals affirmed.[4] We thereafter granted leave to appeal.

## II

At the turn of the century, a Michigan city's autonomy was inferior to a modern state agency. See *Streat v Vermilya,* 268 Mich 1; 255 NW 604 (1934). For example, state lawmakers had the power to select local officers. In addition, state lawmakers modified city charters and made organizational changes to city departments. This interference perpetually fueled public resentment.[5]

In 1908, constitutional convention delegates pro-

---

1. *Except as otherwise provided by this charter or ordinance, the rights, duties, powers, immunities and procedures established by state law shall apply in the collection and enforcement of City property taxes.*

* * *

6. Two years after such a sale of the lien on any real property, the City *may bring a civil action to foreclose its lien.*

If the City prevails in the action, the judgment, which may not be entered before 120 days have expired from the filing of the complaint, shall provide that possession of the real property to which the lien attached shall be given to the City, unless the judgment and all costs are paid within 60 days. There shall be no redemption period under the judgment beyond the 60 days. The judgment when final shall be conclusive evidence of the City's title in fee simple, subject only to unextinguished interests or encumbrances. [Emphasis added.]

It is important to note that the charter has *no express* limitation that the lien foreclosure method is the solitary remedy afforded the city.

[4] Unpublished opinion per curiam of the Court of Appeals, issued January 21, 1993 (Docket Nos. 129624-129629).

[5] In *Marxer v Saginaw,* 270 Mich 256, 258-259; 258 NW 627 (1935), we provide a comprehensive discussion about the relationship between municipalities and early state lawmakers.

Some of them had charters before the organization of the Michigan territorial government. It is unnecessary to consider their common-law origins. They probably arose out of the necessity of having local officers to care for local governmental functions peculiar to the locality which could be better cared for by local officers than by central authority. They are local governmental organizations deriving their power and authority

posed and the Michigan voters approved the following language:

> The legislature shall provide by a general law for the incorporation of cities, and by a general law for the incorporation of villages; such general laws shall limit their rate of taxation for municipal purposes, and restrict their powers of borrowing money and contracting debts. [Const 1908, art 8, § 20.]

> Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter and to amend an existing charter of the city or village heretofore granted or passed by the legislature for the government of the city or village and, through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the Constitution and general laws of this state. [*Id.,* § 21.]

State lawmakers propelled by the Michigan Constitution and the power and authority conferred by it enacted the home rule cities act.[6] The act, among other things, provides that each organized city shall be a body corporate and shall adopt mandatory charter provisions, and allows for other permissible charter provisions. The act also pro-

from the State, organized for the purpose of carrying on local municipal government. City officers locally elected in many cases perform State functions as well as local governmental functions. In the absence of constitutional provision and restriction, matters of local municipal concern in cities may be determined by the citizens themselves. *They were, in this State, for many years, looked after by the legislature.* [Emphasis added.]

[6] Amended by 1911 PA 203, effective August 1, 1911; 1913 PA 5, immediately effective March 11, 1913; 1973 PA 81, § 1, immediately effective July 31, 1973; 1981 PA 175, § 1, immediately effective December 14, 1981; 1986 PA 64, § 1, immediately effective March 31, 1986.

vides for the revision of existing city charters and the creation of a charter commission, and defines the powers and duties of such a commission.[7]

The home rule cities act, MCL 117.1 *et seq.*; MSA 5.2071 *et seq.,* specifically directs the City of Detroit and other home rule cities to enact charters recognizing the power to levy taxes; limiting the subject of ad valorem taxation for municipal purposes to the same subject of state, county, and school purposes under the general law; and setting a maximum rate of taxes. MCL 117.3(f), (g); MSA 5.2073(f), (g). Moreover, home rule cities have power to make all reasonable provisions for the collection of these taxes. *Detroit v Safety Investment Corp,* 288 Mich 511, 515; 285 NW 42 (1939).

The Michigan Constitution provides that "[t]he provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor." Const 1963, art 7, § 34. It also provides that "[n]o enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of

---

[7] In *Streat v Vermilya, supra* at 4, we explained the genesis of the home rule act:

> Public sentiment demanded uniformity in powers and duties in cities and villages, thus making possible unified judicial construction, and, it was claimed, a consequent saving of expense. In 1895, a uniform village charter act (Act No. 3, Pub. Acts 1895, 1 Comp. Laws 1929, § 1465 *et seq.*) was adopted by the legislature and a uniform city charter act (Act No. 215, Pub. Acts 1895, 1 Comp. Laws 1929, § 1796 *et seq.*), providing for the incorporation of cities of the fourth class. The people were not satisfied with the results attained under the so-called uniform charter provisions, and in the constitutional convention of 1908 home rule was demanded, that is, the right of cities to frame and adopt their own charters. The constitutional convention compromised between these two ideas by giving cities the right to frame, adopt and amend their charters, subject, however, to certain broad general restrictions and limitations fixed by the legislature in the so-called home rule act.

authority conferred by this section." Const 1963, art 7, § 22.

Accordingly, it is clear that home rule cities enjoy not only those powers specifically granted, but they may also exercise all powers not expressly denied. Home rule cities are empowered to form for themselves a plan of government suited to their unique needs and, upon local matters, exercise the treasured right of self-governance. See Const 1963, art 7, § 22.[8]

Our municipal governance system has matured to one of general grant of rights and powers, subject only to certain enumerated restrictions instead of the earlier method of granting enumerated rights and powers definitely specified. The convention comment to the most recent amendment of the Michigan Constitution announces best the current relationship between municipalities and the state. It provides that "a revision of Sec 21, Article VIII, of the present [1908] constitution *reflects Michigan's successful experience with home rule.*"

Against this backdrop, we go forward.

III

The matter before us requires the construction

---

[8] Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city . . . heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the *general grant of authority conferred by this section.* [Emphasis supplied.]

of a home rule city charter. The prevailing rules regarding statutory construction are well established and extend to the construction of home rule charters. *Brady v Detroit,* 353 Mich 243, 248; 91 NW2d 257 (1958). Therefore, we are required to construe the charter's language by its commonly accepted meaning as long as it does not produce absurdity, hardship, injustice, or prejudice to the drafters and ratifiers. *Reisman v Regents of Wayne State Univ,* 188 Mich App 526, 536; 470 NW2d 678 (1991).

Here, we must determine whether § 8-403(1) of the Detroit City Charter incorporates by reference the provisions of state law, specifically the 1988 amendment of the General Property Tax Act that allows local governments to collect delinquent real property taxes by suing the taxpayer personally.

The Detroit City Charter, in its general powers section, directs that the specific mention of particular powers in the charter *shall* not be construed as a limitation of the powers of the city conferred by the constitution and state law, and that the powers of the city under the charter shall be construed liberally in favor of the city.[9] Moreover, several sections of the 1974 Detroit City Charter

---

[9] Section 1-102 provides:

The city has the comprehensive home rule power conferred upon it by the Michigan Constitution, subject only to the limitations on the exercise of that power contained in the Constitution or this Charter or imposed by statute. *The city also has all other powers which a city may possess under the Constitution and laws of this state.* [Emphasis added.]

Section 1-103 provides:

The powers of the city under this Charter shall be construed liberally in favor of the city. *The specific mention of particular powers in the Charter shall not be construed as limiting in any way the general power stated in this article.* [Emphasis added.]

incorporate by reference provisions of state law.[10] Nonetheless, in *Joy Management v Detroit, supra* at 733, the Court of Appeals held that art 8, § 8-403 of the Detroit City Charter only authorized a single means of collecting delinquent real property taxes.[11]

In *Joy Management,* the City of Detroit attempted to settle delinquent real property taxes by seizing fire insurance proceeds. The circuit court ruled that statutory law then in effect precluded seizure of insurance proceeds as intangibles.[12] The Court of Appeals affirmed and went several steps further to conclude that the city's charter afforded merely one remedy for collecting unpaid real property taxes:

Defendant's charter limits defendant's remedy
_____

[10] For example, the elections article, § 3-104, and its commentary provides as follows:

*Except as otherwise provided by this charter or ordinance, state law applies to the qualifications and registration of voters, the filing for office by candidates, and the conduct and canvass of City elections.*

COMMENTARY

This section incorporates by reference the provisions of the Michigan general election law, making them applicable to City elections (as nearly as possible) except where specific contrary provisions are contained in the new charter or in ordinance. [Final Report of the Detroit Charter Revision Comm, Commentary to § 3-104, p 6. Emphasis added.]

[11] The City of Detroit appealed this adverse ruling; however, we denied leave. 433 Mich 860 (1989). It is important to emphasize that in Michigan, denial of leave has no substantive effect on a particular case.

[12] We also note that this case was decided before MCL 211.47; MSA 7.91. The most recent amendments clearly permit a city treasurer to seize personal property for sale, and allow the city to bring an in personam action on a debt to collect taxes. Furthermore, we have no comment regarding this portion of the Court of Appeals decision.

to an action for foreclosure on the tax lien. Section 8-403 of the Detroit City Code provides that the city may bring a civil action to foreclose its lien two years after the city's lien on real property for delinquent city real property taxes accrues. The city's charter does not provide any other method for the city to collect delinquent real property taxes. Even if § 47 [MCL 211.47; MSA 7.91] were to allow the city treasurer to place a lien on insurance proceeds, defendant's own charter does not authorize it to do so. The General Property Tax Act does not apply to cities whose charters provide inconsistent provisions. MCL 211.107; MSA 7.161. [*Id.* at 733-734.]

In the case before us, the Court of Appeals similarly held that the city's sole means of collecting delinquent real property taxes was by lien and foreclosure. Defendants argue that the Detroit City Charter's article 8, before its 1991 amendment, expressly provided that the sole remedy available to the City of Detroit to collect unpaid real property taxes was the lien foreclosure remedy. We do not agree.

When the Detroit City Charter was adopted in 1974, the 1893 General Property Tax Act mentioned two methods to *enforce* and *collect* delinquent real property taxes. One was the lien foreclosure procedure set forth in MCL 211.61; MSA 7.105[13] and the other was the seizure and sale of

---

[13] Under MCL 211.61 *et seq.*; MSA 7.105 *et seq.*, "the state treasurer [was] required to file a petition in the circuit court for the county where the assessed real property [was] located, for entry of a court decree directing that the property be sold by the county treasurer at the annual county tax sale. . . . After notice, hearing, and entry of the decree, the county treasurer [was] authorized to accept bids by private individuals, as well as the state, and [was] required to issue to the successful bidder a certificate stating that the bidder, or purchaser, [would] be entitled to a deed after the expiration of the one year period of redemption from sale afforded the owner under MCL 211.74; MSA 7.120. After the deed [was] issued at the end of the one year redemption period, a notice of the right to redeem, or notice of

the taxpayer's personal property as set forth in MCL 211.47; MSA 7.91.[14] Therefore, at the time of the 1974 enactment, § 8-403(1) incorporated by reference the collection provisions of MCL 211.47; MSA 7.91 (seizure and sale of personal property) and the lien foreclosure method of MCL 211.61 *et seq.*; MSA 7.105 *et seq.*, "[e]xcept as otherwise provided by [the] charter . . . ."[15]

The Detroit City Charter language contained in art 8, § 8-403 is plain and unambiguous. The charter declares that state law regarding property tax collection applies unless the charter provides otherwise.[16] Therefore, in order to embrace defendants' positions, we would have to find that the City of Detroit deliberately precluded itself from exercising the broad powers granted by our Michigan Constitution.

Defendants suggest that the express inclusion of one procedure manifests exclusion of all others,

---

reconveyance, signed by the purchaser, [was required to] be served, which entitle[d] the owner to redeem within an additional six month period, upon payment of all delinquencies and 50% in addition. MCL 211.140; MSA 7.198."

[14] The plaintiff notes:

In 1987, the Michigan Legislature amended the General Property Tax Act, MCL 211.47; MSA 7.91, to provide that city and township treasurers could institute an in personam action to collect "any" delinquent taxes on personal property owed by individual or corporate tax payers, regardless of whether the treasurer had attempted to seize personal property for sale at public auction. [1987 PA 177.] Prior to the passage of the amendment, the General Property Tax Act required treasurers to first exhaust seizure procedures before filing a lawsuit for delinquent personal property taxes.

In 1988 PA 202, the Legislature further amended the Act to provide that the city and township treasurers could institute an in personam action for any delinquent property tax, regardless of whether the treasurer had attempted seizure of property for sale at public auction.

[15] See n 10.
[16] See n 3.

and that that should be the reason why the city foreclosure method must be construed as being the sole remedy available to the city. Their arguments, however, fail because they ignore the language of the city charter and its instructive commentaries. The 1974 Charter Comments purposefully provide:

> Subsection 8-403(1) *incorporates by reference the provisions of state law for the collection and enforcement of property taxes.* As a result, it has been possible to eliminate 14 pages of procedural detail contained in chapter 4 of title 6 of the present charter.
>
> With respect to subsection 8-403(2), state law provides "all taxes shall become a debt due to the . . . city" on December 31st. See CL 1948 211.81, 211.2 and 211.13.
>
> In two important respects, however, Detroit's law and procedure is different from, and preferable to, the law and procedure of the state.
>
> First, there is no counterpart in state law for the right granted Detroit property taxpayers to pay in 2 installments. Second, state law permits the sale of liens for delinquent property taxes to private tax title speculators, often to the great prejudice of the owner whose taxes are delinquent. Because of the abuses that can result, the Detroit treasurer, for some years, has not sold to private persons the City's lien for delinquent City real property taxes but has collected those delinquent taxes himself.
>
> Detroit's current practice on both these matters is retained in the new charter. [Final Report of the Detroit Charter Revision Comm, Commentary to Art 8, § 8-403, p 37. Emphasis added.]

Moreover, defendants direct the Court to *Fink v Detroit,* 124 Mich App 44; 333 NW2d 376 (1983), for the holding that a city charter takes priority over the General Property Tax Act. In *Fink,* the Court noted that the General Property Tax Act

applies only where it is consistent with respect to the charter provision involved. However, defendants' reliance on *Fink* is clearly misplaced because the charter differs only with regard to the state's exhausting foreclosure sale procedure.

Defendants further highlight *Fink,* for a semantic discourse on "shall" versus "may" as contained in § 8-403(6).[17] The defendants state with conviction:

> In examining the context of that term as used in the Charter, it is clear that the word "may" means "shall." The Charter does not contain any other option for bringing an action to recover unpaid taxes. If any other action was available, it would have been specifically included in the original Charter. In this context, the word "may" was used to authorize the City to bring a civil action to foreclose upon its lien, as opposed to taking no action at all to foreclose. That was the option available to the City at the time.

Defendants have engaged in a semantic war. However, such a battle is futile when the drafters' and ratifiers' intent is clear as it is here. The comments suggest no intention to exclude from the incorporation by reference of state law any provision for the collection of taxes other than portions of the lien foreclosure procedure of state law.[18]

Assuming arguendo, that the city charter in effect failed at the time the actions were filed to incorporate by reference the additional tax collection remedy, the city attempted to stop the hemorrhaging arguably caused by the loss of tax reve-

[17] See n 3.

[18] Thus, it is clear that the drafters intended to adopt a different and better procedure for realty tax lien foreclosure different in part from the tax lien foreclosure procedure set forth in the General Property Tax Act, MCL 211.61 *et seq.*; MSA 7.105 *et seq.*

nue resulting from the *Joy Management* decision
and other delinquent taxpayers like the defen-
dants. Consequently, in 1991, the Detroit City
Charter was amended to allow the city to main-
tain a personal action against a delinquent real
property taxpayer.[19]

It is well settled by this Court that when an
amendment is enacted soon after controversies
arise regarding the meaning of the original act,
" 'it is logical to regard the amendment as a
legislative interpretation of the original act
. . . .' " *Detroit Edison Co v Revenue Dep't,* 320
Mich 506, 519-521; 31 NW2d 809 (1948), quoting 1
Sutherland, Statutory Construction (3d ed), § 1931,
p 418. See also *People v Khoury,* 437 Mich 954;
467 NW2d 810 (1991); *Detroit Edison Co v Janosz,*
350 Mich 606, 613-614; 87 NW2d 126 (1957). In our
case, the amendment of the Detroit City Charter
clarifies what the drafters' and ratifiers' intent had
been all along.

The Court of Appeals in the case at bar and *Joy
Management*[20] was incorrect in its rulings. Each
panel failed to give effect to the drafters' and
ratifiers' intent. Each disregarded the express pro-
visions that permit incorporation by reference,
such as § 8-403(1). Moreover, the decisions ren-

---

[19] On June 4, 1991, the citizens of Detroit amended § 8-403 and
added the following subsection 7:

In addition to the other remedies specified in this section, at
the time unpaid city property taxes become delinquent or at
any later time permitted by law, the city may maintain per-
sonal action against the debtor for collection of the unpaid
property taxes and may use any means permitted by law for
collection of the debt. The city of Detroit tax roll shall be prima
facie evidence of the amount of the indebtedness to the city of
Detroit. The preceding sections of 8-403 are not the exclusive
remedies of the city of Detroit.

[20] Our ruling today only overturns the decision regarding the city's
incorporation by reference language.

dered nugatory other provisions of the Detroit City Charter.[21]

The general powers of a home rule city as expressed by §§ 1-102 and 1-103 of the Detroit City Charter naturally adopt future amendments.[22] Moreover, the charter is the organic law of the City of Detroit, and, absent a clear declaration by its citizens to preclude provided by state law, we find that the 1974 Detroit City Charter incorporates by reference the tax collection remedies afforded by the General Property Tax Act and all future amendments of the act, including 1988 PA 202, MCL 211.47; MSA 7.91.[23]

IV

A

Defendants argue in the alternative that it is impermissible to retroactively apply 1988 PA 202 because the amendment creates a new right for plaintiff and creates a new liability for the defendants, i.e., personal liability for real property taxes where they did not exist before. The concern regarding the retroactivity of statutes arises from constitutional due process principles that prevent retrospective laws from divesting rights to property or vested rights, or the impairment of contracts. See, e.g., US Const, art I, § 10; Const 1963, art 1, § 10. See also *Hansen-Snyder Co v General Motors Corp,* 371 Mich 480; 124 NW2d 286 (1963);

---

[21] A home rule city may implement collection procedures not delineated in the General Property Tax Act, subject to Michigan's Constitution and laws. See n 8.

[22] See n 9.

[23] Assuming arguendo, that an ambiguity exists with regard to whether the charter incorporates the General Property Tax Act, the ambiguity must be resolved in favor of the city. See Const 1963, art 7, § 34; charter, art 1, § 1-103.

*Stott v Stott Realty Co,* 288 Mich 35; 284 NW 635 (1939).

In the case before us, defendants do not claim that the retroactive application of 1988 PA 202 injuriously affects any contractual obligations. Therefore, we assume that defendants allege that the retroactive application of this statutory amendment adversely affects some vested right. We do not agree.

### 1. VESTED RIGHT

A vested right has been defined as an interest that the government is compelled to recognize and protect of which the holder could not be deprived without injustice. *Cusick v Feldpausch,* 259 Mich 349, 352; 243 NW 226 (1932), citing 2 Cooley, Constitutional Limitations (8th ed), p 749. Nonetheless, when determining whether a right is vested, policy considerations, rather than inflexible definitions must control, and we must consider whether the holder possesses what amounts to be a title interest in the right asserted. We explained in *Minty v Bd of State Auditors,* 336 Mich 370, 390; 58 NW2d 106 (1953):

> "It would seem that a right cannot be considered a vested right, unless it is something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or a legal exemption from a demand made by another."

See also *Wylie v Grand Rapids City Comm,* 293 Mich 571, 587; 292 NW 668 (1940).

In the case at bar, defendants suggest that the

new enforcement procedure creates a new liability and therefore infringes on a right deserving protection. As we articulated in *Minty,* the holder must have more than an expectation that the tax collection procedures would remain unchanged. Here, defendants would have us include within the realm of vested rights immunity from the retroactive operation of a tax collection procedure implemented to secure delinquent taxes owed to a municipality where there is no question that the amendment is not expanding the defendant's preexisting indebtedness. We refuse to do so.

The underlying concern is that allowing in personam actions may affect the character of the *remedy* or the character of the *tax.* In this case, allowing an in personam action does not change the character of the tax because the amount of the tax itself has not been altered. The taxes assessed against defendants' property were never forgiven and then reinstated as a result of the new enforcement procedure. Quite the opposite. They are debts defendants elected not to pay. Thus, its character as a property tax has never been affected.[24]

---

[24] Upon initial review, there appears to be precedent supporting a finding that a tax assessment against land alone may not be retroactively transformed into a personal obligation of the taxpayer. See *Grand Rapids v Lake Shore & M S R Co,* 130 Mich 238; 89 NW 932 (1902), and *Weber v Detroit,* 158 Mich 149; 122 NW 570 (1909). However, those cases are easily distinguishable from the case before us. Both are the progeny of *Mogg v Hall,* 83 Mich 576; 47 NW 553 (1890). In *Mogg,* certain parcels owned by the plaintiff had been assessed. The Duplain Township treasurer in 1884 sought to recover delinquent taxes for drain assessments. At the time, the drain law of 1881 was in effect and did not contain any provision "making the drain tax a personal claim against the owner of land," but instead declared a failure to pay taxes due to constitute a lien on the land, and provided for a sale of the land in case of nonpayment. *Id.* at 580. To eliminate any doubt, the Court noted that the 1885 drain law expressly stated that an in personam action to collect taxes was permissible, thereby curing a defect in the 1881 act.

Similar to *Mogg,* in *Grand Rapids* and *Weber,* personal liability was attached to the taxpayer after the taxes had been assessed. At the time of *Grand Rapids, Weber,* and *Mogg,* neither the pertinent tax

Today, as we have in the past, we refuse to make delinquent taxpayers immune from the imposition of statutory obligations. It is instructive to revisit our decision in *Detroit v Safety Investment, supra,* p 516, in which we discussed what tax collection was like before and after the enactment of the General Property Tax Act, 1893 PA 206, MCL 211.1 *et seq.*; MSA 7.1 *et seq.* We said:

> "Under the old law, the prudent and honest men paid their taxes; *the careless and dishonest did not.* Under that system the prudent and honorable men paid more than their fair share of the public burdens. [*The General Property Tax Act*] *was aimed to cure this evil, and should be liberally construed.*" [288 Mich 516. Citation omitted; emphasis added.]

Property tax collection is essential to the eco-

---

law nor the charter regarding the assessments under review authorized in personam actions or stated that personal liability attached.

Moreover, any reliance on those cases is tenuous at best, because each case lacked a substantive analysis of why a tax on land cannot be transformed into a personal obligation. Nevertheless, the law has come a long way since *Mogg,* and today, personal liability attaches the moment taxes are assessed. In *Gilken Corp v Comm'r of Internal Revenue,* 176 F2d 141, 143-144 (CA 6, 1949), the United States Court of Appeals for the Sixth Circuit decided that, under Michigan law, the real and personal property taxes assessed before the taxpayer acquired title or possession were the personal liability of the taxpayer's vendor. The court looked to the Detroit City Charter, § 8-403(2) " 'all city taxes shall become a debt' " language and stated:

> We cannot accept as valid the argument of petitioner that Michigan realty taxes are exclusively in rem and that there is no personal liability for them. We think the contrary to be true. [See] *Gulf Refining Co v Perry,* 303 Mich 487, 490; 6 NW2d 756 (1942).

In *Gulf Refining,* we stated that despite the defendant having had a mortgage foreclosed, and the mortgagee's title, having subsequently become absolute: "The tax assessment against defendants Perry [concerning *real* property] was a debt due from them to the city of Lansing. Perry's *personal* property was subject to seizure and sale for the amount of the tax." *Id.* at 490 (emphasis added).

nomic security and social stability of Detroit and other municipalities, as well as the state. As a matter of policy, it is imperative that taxpayers do not hide behind the facade of vested rights in an attempt to evade their financial responsibilities. As explained by one commentator:

> Traditionally, the property tax—and in particular, the tax on real property—has been the mainstay of municipal revenue-gathering—the largest single source of municipal revenue. . . . But the property tax has numerous advantages that may keep it in use to a considerable extent: (1) Property, especially real property, is directly benefited by many municipal services, such as fire protection and garbage collection. Thus, there is a certain fairness in assessing the costs of these services on the basis of the value of property benefited thereby. (2) It is fairly easy to forecast in advance the amount of revenue that the real-property tax in a particular locality will produce, thus facilitating the budget process. (3) The real-property tax is not likely to be used by the federal government; it is thus one of the few potential sources of municipal income that is untapped by the U.S. government. And the full potential of the real-property tax has not been realized, since much urban property is assessed, and thus taxed, at substantially less than its current fair-market value. [Reynolds, Local Government Law, § 96, pp 291-293.]

Recently, in *Taxpayers United v Detroit,* 196 Mich App 463, 466; 493 NW2d 463 (1992), a Court of Appeals panel held that the retroactive revival of Detroit utility users tax is constitutional because the 1990 law did not create a novel tax. Plaintiffs were not assessed a retroactive fee for engaging in a voluntary act they might have forgone had they been aware of the tax. *Id.* at 468. The panel reasoned that the 1990 law did not violate the Due Process Clauses of the United

States or Michigan Constitutions because it applied the same type and rate of tax to the same group of taxpayers.

Similarly, the tax collection method in the case before us is not a novel tax because it does not enlarge the preexisting tax debt. On the contrary, 1988 PA 202 is a procedural device to secure taxes owed. Defendants are not being taxed as a result of voluntary activities that they might have forgone had they been aware of the tax. Rather, had defendants elected to forgo the activities at issue in this case, namely, their refusal to pay property taxes, they would have ended up in exactly the same situation in which they now find themselves —in short, paying their taxes.[25]

It is firmly established that there is no vested right in any particular procedure or remedy. See *Hanes & Co v Wadey,* 73 Mich 178, 181; 41 NW 222 (1889). Moreover, it is also well established that a taxpayer does not have a vested right in a tax statute or in the continuance of any tax law. *Ludka v Treasury Dep't,* 155 Mich App 250; 399 NW2d 490 (1986). See 6 Michigan Law & Practice, Constitutional Law, § 223, pp 248-249; 16A CJS, Constitutional Law, § 246, pp 49-52.

For instance, in *Webster v Auditor General,* 121 Mich 668; 80 NW 705 (1899), a provision of the General Property Tax Act of 1893 regarding the assessment, levy, and the return of land for delinquent taxes was amended. The dispute involved the retroactive operation of the interest added to delinquent taxes. The Court noted that a landowner has a duty to pay taxes and to pay them when they become due. The interest imposed on delinquent taxes serves multiple purposes, one of which is to encourage the timely payment of prop-

---

[25] In other words, they pay their taxes, either voluntarily or by being subject to an in personam collection action.

erty taxes. Consequently, the Court held that one who owes delinquent taxes has no vested right to have the rate of interest thereon remain unchanged. *Id.* at 674.

In this action, 1988 PA 202 did not create, enlarge, diminish, or destroy contractual or vested rights. Rather, it implemented an additional enforcement mechanism that the city may use to effect its preexisting constitutional and statutory right to assess and collect city property taxes. Furthermore, because the procedure relates only to tax collection remedies or procedures, it does not fall within the general rule against retrospective operation:

> The constitutional prohibition of the passage of retroactive laws refers only to retroactive laws that injuriously affect some substantial or vested right, and "does not refer to those remedies adopted by a legislative body for the purpose of providing a rule to secure for its citizens the enjoyment of some natural right, equitable and just in itself, but which they were not able to enforce on account of defects in the law or its omission to provide the relief necessary to secure such right." [*Stott* at 46.]

In *Hansen-Snyder,* this Court observed:

> [Amendments of] statutes related to remedies or modes of procedure, which do not create new or take away vested rights, but only operate in furtherance of a remedy or confirmation of rights already existing, do not come within the legal conception of retrospective law, or the general rule against retrospective operation of statutes. [*Id.* at 485.]

In fact, statutes or amendments that relate only to procedure, prima facie apply to all actions that

have accrued as well as future actions, unless the amendment expressly provides otherwise. *Stott, supra* at 46. We acknowledge that generally the distinction between remedial procedures and the impairment of vested rights is difficult to draw. However, it is clear that defendants have no property or title interest in our state or local tax collection methods. A vested right may encompass many things, but this is not one of them.

Finally, although it is remedial, the retroactive reach of 1988 PA 202 has statutory limitations. MCL 600.5813; MSA 27A.5813 provides that personal actions not otherwise provided for are subject to a six-year limitation period. An in personam suit to collect real property taxes is clearly a personal action. See *Borden, Inc v Treasury Dep't,* 391 Mich 495; 218 NW2d 667 (1974). Because an in personam suit to collect delinquent real property taxes becomes a personal action, we also find that the general six-year limitation statute applies. *In re Atkinson Estate,* 305 Mich 323; 9 NW2d 588 (1943).

CONCLUSION

Our decision today affirms the integrity of not only the City of Detroit's charter, but Michigan statutory law as well. We find that the Detroit City Charter incorporates the General Property Tax Act, and hold that the amendment of MCL 211.47; MSA 7.91 is remedial and may be retroactively applied. Noting the restraint imposed by MCL 600.5813; MSA 27A.5813, we remand this case to the trial court for proceedings consistent with this opinion.

CAVANAGH, C.J., and BRICKLEY and BOYLE, JJ., concurred with MALLETT, J.

RILEY, J. I respectfully dissent for several reasons. First and foremost, there exists binding authority for the proposition that changes in the method of tax collection that alter the nature of collection from an in rem to an in personam action are unconstitutional to the extent that they apply retroactively, i.e., to taxes previously assessed. Second, statutes governing the collection of taxes are to be strictly construed with all doubts to be construed in favor of the taxpayer. Contrary to the majority's assertions, the 1974 charter provisions at issue are far from clear on the issue whether the charter provides for, or even preserves the right to utilize, methods of tax collection other than the judicial sale method provided in charter § 8-403. In fact, I am persuaded that the clear intent of the charter's ratifiers was to limit the method of tax collection to the judicial sale set forth in § 8-403. Third, careful analysis of the historical backdrop provides, if implicitly, a strong policy reason for limiting plaintiff's tax collection powers. Although this Court's inquiry could more appropriately be decided without resort to policy arguments, I offer a plausible reason for the ratifiers' intent to limit plaintiff's tax collection powers. Thus, the language at issue is ambiguous at best. In turn, resort to a construction in favor of the taxpayer is in order.

I

A

It is important to understand the history and the mechanics of the tax lien in the area of real property law. The first step is to distinguish real and personal property taxes from other forms of taxation such as the excise tax. Property taxes are assessments on real and personal property within a specific territory, measured in proportion to its

value, and whose obligation for payment is absolute.[1] In contrast, an excise tax is a "privilege" tax that is not imposed *directly* upon persons or property,[2] but that is instead levied on activities that are voluntarily assumed to the degree to which the privilege is exercised.[3] Accordingly, it has generally been said that property taxes burden the property assessed, but do not constitute personal debts of an individual in the ordinary sense.[4]

A taxpayer's proportionate share of debt for the general revenue is secured only by property owned at the time a lien attaches and only on property located within the taxing district.[5] To be sure, the taxing legislature may secure the payment of de-

[1] 71 Am Jur 2d, State and Local Taxation, § 24, p 358.

[2] *Id.,* § 28, pp 360-361.

[3] *Id.,* §§ 28-29, pp 360-362. See also *Dooley v Detroit,* 370 Mich 194, 204-206; 121 NW2d 724 (1963) (upholding Detroit's income tax ordinance as an excise tax); *Continental Motors Corp v Muskegon Twp,* 376 Mich 170, 180; 135 NW2d 908 (1965) ("A basic distinction between an ad valorem property tax and an excise tax is that the former is regarded as primarily *in rem* in nature while the latter is regarded as *in personam* in nature").

[4] See, generally, 71 Am Jur 2d, State and Local Taxation, § 5, pp 345-346; 72 Am Jur 2d, State and Local Taxation, § 836, pp 142-143, § 869, pp 170-171. See also Rockwell, *Easement, servitude, or covenant as affected by sale for taxes,* 7 ALR5th 187, § 2, p 202; 1 Cooley, Taxation (4th ed), § 22, p 88.

In his landmark treatise on taxation, Justice COOLEY defined the relationship between taxpayer, tax, and the taxpayer's property as follows:

The individual, and not his property, pays the tax. *The property is resorted to for the purpose of ascertaining the amount of the tax with which the owner must be charged, and for the purpose of enforcing payment when the owner shall be legally in default* in paying at the time stipulated by law. [*Id.,* § 24, p 93. Emphasis added.]

In other words, property provides a basis for assessment of a particular taxpayer's share of the tax burden, and it also provides security for the payment thereof. With this form of enforcement in place, the questions arise whether and when other methods of enforcement are permissible or even necessary.

[5] 3 Cooley, n 4 *supra,* § 1235, pp 2458-2459.

linquent taxes with real or personal property.[6]
However, a line of demarcation has been drawn
between the right of seizure and sale of real or
personal property and a personal obligation for
taxes that permits a lawsuit for the collection of
delinquent taxes, i.e., an in personam action.[7]
While some states permit in personam actions for
the collection of delinquent tax liability,[8] the gen-
eral rule indicates that no personal action will lie
against a delinquent taxpayer at law or in equity.[9]
As one author has stated:

> Generally, . . . the rule developed that *in the
> absence of an explicit statutory provision, no per-
> sonal action will lie to recover property taxes.*
> These holdings are grounded on the theory that
> taxes are not debts, or in the view that since the
> statute provides only for proceedings *in rem,* per-
> sonal liability is not imposed. [Hellerstein, State
> and Local Taxation (3d ed), p 702. Emphasis
> added.]

Another source provides:

_____

[6] See *id.,* § 39, pp 118-122. However, Justice COOLEY notes inherent
problems with the taxation of personal property. Review of these
reasons makes clear some of the likely reasons why plaintiff has not
engaged in proceedings to collect back taxes by seizing and selling
personal property and why it now prefers an in personam remedy
rather than the procedure for distress clearly permitted under state
law.

See also *id.,* § 1327, p 2624 ("the power of the legislature to make
taxes assessed against real or personal property is unquestioned");
§ 1323, pp 2612-2613 ("So far as personal property is concerned,
nearly every kind is subject to compulsory process, *so far as found
within the tax district,* provided it is within the terms of the tax
statute providing what personalty shall be subject and provided it is
not expressly exempted") (emphasis added). Cf. 72 Am Jur 2d, n 4
*supra,* § 868, p 169 ("nothing can be taken under a distress [action]
but tangible property capable of seizure and sale, and . . . intangible
property, such as shares of stock in corporations, . . . cannot lawfully
be taken on distress").

[7] 3 Cooley, n 4 *supra,* § 1327, pp 2624-2625.

[8] *Id.,* p 2625.

[9] *Id.,* § 1329, pp 2626-2627.

> In the absence of constitutional restrictions, the
> legislature has plenary power to make any change
> in the method of collecting taxes, *but the amend-
> ment . . . of a statute providing for the levy and
> collection of taxes will not operate retrospectively
> so as to affect unpaid taxes already due or pending
> proceedings for their collection* . . . . [84 CJS,
> Taxation, § 642, p 1318. Emphasis added.]

Before turning to specific state law on the issues
involved, it is instructive to review certain other
general propositions that arise in this context.
First, laws on taxation must be strictly construed,
with any ambiguities to be decided in favor of the
taxpayer.[10] Second, statutes creating tax liens are
not to be enlarged by construction.[11] Finally, the
method of collection that is prescribed by statute
(or charter) is generally the exclusive method.[12]

B

This Court had the opportunity to address a
similar issue nearly a century ago. In *Grand Rap-
ids v Lake Shore & M S R Co,* 130 Mich 238; 89
NW 932 (1902), the Court was called on to deter-
mine whether an amendment of a city charter
providing for personal liability could be applied to
taxes for improvements to real property that had
already been assessed. Six justices agreed that a
change in collection methods from in rem to in
personam could not apply retroactively. See also
*Weber v Detroit,* 158 Mich 149; 122 NW 570 (1909)
(a property owner could not be made personally
liable for a special assessment tax created at a

[10] 2 Cooley, n 4 *supra,* § 503, pp 1113-1119. But see *id.,* § 504, pp
1120-1122, collecting cases for the opposite proposition. See also 72
Am Jur 2d, n 4 *supra,* § 866, p 168 (tax collection provisions are also
to be strictly construed against the taxing authority).

[11] 3 Cooley, n 4 *supra,* § 1230, p 2452.

[12] *Id.,* § 1326, p 2621; 72 Am Jur 2d, n 4 *supra,* § 870, pp 171-172.

time when the city charter provided for enforcement only against real property).[13]

The majority attempts to avoid this precedent although it is dispositive.[14] Whether plaintiff reserved the right to seize personal property in the applicable sections of the 1974 charter is the subject of later argument, but it cannot be gainsaid

---

[13] Cf. *Lucking v Ballantyne*, 132 Mich 584; 94 NW 8 (1903), superseded by statute as stated in *Michigan Nat'l Bank v Auburn Hills*, 193 Mich App 109; 483 NW2d 436 (1992) (taxes assessed on tangible personal property could not be enforced retroactively, but rather could only be applied prospectively under the terms of the existing Detroit City Charter). See, also, e.g., *Commonwealth ex rel Martin v Stone*, 279 Ky 243; 130 SW2d 750 (1939) (real estate taxes are not collectible by suit unless a personal action is expressly authorized, and the statute finally imposing personal liability was not given retroactive effect).

[14] Careful review of the authorities cited in the majority opinion makes clear their inapplicability to the issue at hand. In *Hansen-Snyder Co v General Motors Corp*, 371 Mich 480; 124 NW2d 286 (1963), *ante*, p 698, this Court treated the extension of a lien filing date as procedural. However, the nature of the remedy, i.e., a mechanic's lien to secure payment for materials and services supplied, was unchanged. *Stott v Stott Realty Co*, 288 Mich 35; 284 NW 635 (1939), *ante*, p 699, involved a corporate privilege tax rather than a real property tax, which, as provided earlier, varies with the level of prescribed activity. See also *Taxpayers United v Detroit*, 196 Mich App 463, 466; 493 NW2d 463 (1992), *ante*, p 702 (utility tax), and *Ludka v Treasury Dep't*, 155 Mich App 250; 399 NW2d 490 (1986), *ante*, p 703 (income tax). *Hanes & Co v Wadey*, 73 Mich 178, 181; 41 NW 222 (1889), *ante*, p 703, concerned a lienholder's inability to use the previously mandated form of lien collection, i.e., the amendment of a statute did not retroactively preserve the old method of collection that was more favorable to the lienholder. It had nothing to do with the retroactive application of a new form of tax collection. In *Webster v Auditor General*, 121 Mich 668; 80 NW 705 (1899), *ante*, p 703, this Court unanimously agreed that a change in the interest rate charged for delinquent taxes as a condition to redemption before judicial sale could be applied retroactively. Because the choice to redeem was discretionary, property owners were not obligated to pay the interest charge or the increase. Moreover, it is clear that the purpose of the increase was to defray the costs incurred by seizing real property for delinquent taxes only to have the property redeemed before sale. *Id.* at 671. Thus, the purpose was to ensure recoupment of costs incurred in the judicial sale process rather than secure payment of the delinquent tax liability through the use of a new form of collection.

that the procedure described in § 8-403 is in the nature of an in rem proceeding.[15]

The Legislature amended MCL 211.47; MSA 7.91 to permit the filing of in personam actions against delinquent taxpayers by way of 1987 PA 177 and 1988 PA 202. Because the legislators did not create a specific provision for retroactive application of this new procedure, we may assume for purposes of this case that its application is prospective.[16]

---

[15] See *Detroit v O'Connor,* 302 Mich 531, 535; 5 NW2d 453 (1942) (tax foreclosure proceedings under the existing city charter were in rem actions); *Thompson v Auditor General,* 261 Mich 624, 649, 657; 247 NW 360 (1933). See also *United States v Michigan,* 346 F Supp 1277, 1280 (ED Mich, 1972) ("The law in Michigan is explicit in stating that the enforcement of an *ad valorem* tax is an *in rem* proceeding against the property rather than the owner"). There are cases that may be cited for the proposition that city taxes are personal to the landowner. While this is true, it does not support the proposition that actions to collect delinquent taxes are in personam in nature. For example, in *Gulf Refining Co v Perry,* 303 Mich 487; 6 NW2d 756 (1942), this Court stated that a tax assessment was a debt due to the City of Lansing for which the defendants were responsible. However, the Court went on to indicate that collection was to be had under a state law permitting seizure and sale of personal property. Clearly, the case involves an action for distress and sale of personal property, which is not the same as an in personam action.

In *Gilken Corp v Comm'r of Internal Revenue,* 176 F2d 141, 143 (CA 6, 1949), the United States Court of Appeals for the Sixth Circuit noted that the existing Detroit City Charter " 'makes the tax a debt of the owner . . . .' " However, that case involved the question who is entitled to an exemption for the payment of state taxes under federal tax law. In other words, the case had nothing to do with the nature of the debt or the assets securing it. Cf. *United States v Michigan, supra.*

Finally, the majority's attempt to distinguish this line of authority by interpreting *Mogg v Hall,* 83 Mich 576; 47 NW 553 (1890), is unavailing. While an 1885 amendment of the relevant statute may have "cured" the defect, even a casual reading of *Mogg* only permits a single conclusion: the "cure" could not be applied retroactively. In the Court's own words,

> This act [the 1885 amendment creating personal liability] could not have the retrospective action contemplated . . . . Taxes levied after the act went into effect may properly be made a personal claim, but the rejected taxes of 1884, reassessed under the act of 1885, cannot, in our opinion, be made a personal claim against the owner of the land. [83 Mich 582.]

[16] See *Selk v Detroit Plastic Products,* 419 Mich 1, 9; 345 NW2d 184 (1984).

While I agree that municipalities operating under the home rule cities act, MCL 117.1 *et seq.*; MSA 5.2071 *et seq.* and its predecessors[17] are empowered to develop tax collection procedures that vary from those contained in MCL 211.47; MSA 7.91, I cannot agree that this discretion permits retroactive, in personam collection of delinquent taxes where it appears that all other municipalities would not have such power until 1987 and thereafter.[18] More-

---

In *Municipal Investors Ass'n v Birmingham,* 298 Mich 314, 325; 299 NW 90 (1941), this Court had the following to say about the intent behind amendments to the statutes providing for judicial sale of real property for delinquent taxes:

> The clear import of the language of the foregoing amendatory enactments, and the obvious intent and purpose of the legislature to relieve owners from the weight of accumulated obligation . . . must lead one to the conclusion that when title to [real property] became absolute in the State of Michigan upon expiration of the period of redemption provided by the tax law free of all taxes and other liens and incumbrances of whatever kind or nature, and future and deficiency as well as past assessments and taxes were cancelled. To hold otherwise would defeat the purpose of this remedial legislation . . . . [Citation omitted.]

The remedial purpose alluded to by the *Municipal Investors* majority had two important facets. The first was to ensure a method of payment of property taxes assessed to support the general welfare. The second was to protect landowners from the accumulation of significant tax liability through the mechanism of judicial sale.

> "The primary and inducing purpose of the legislation was to secure a portion of the unpaid taxes, rather than nothing, and to restore lands to a taxpaying basis, instead of supinely allowing them to accumulate tax delinquencies . . . ." [*Id.* at 321, quoting *Baker v State Land Office Bd,* 294 Mich 587, 606; 293 NW 763 (1940).]

In light of the pronouncement of legislative intent by this Court, together with the complete lack of any language on retroactivity in 1987 PA 177 and 1988 PA 202, I am convinced that the novel in personam action was intended to have prospective effect.

[17] See *ante,* pp 689-690.

[18] Cf. *Schaefer v Woodmere Cemetery Ass'n,* 256 Mich 332, 333; 239 NW 300 (1931) (courts are without jurisdiction to entertain personal lawsuits for the collection of general property taxes and special

over, early cases that address a virtually identical issue mandate against retroactive application of a tax collection method that changes the nature of the liability from in rem to in personam. *Grand Rapids* and *Weber, supra.*

For all the foregoing reasons, I conclude that plaintiff is precluded from bringing an in personam action against property owners for the payment of delinquent property taxes for the time periods at issue under the doctrine of stare decisis.[19]

II

The majority asserts that the relevant language contained in the 1974 charter clearly and unambiguously reserves the right to utilize any taxing authority permitted by the Legislature. While I agree that the language is clear, I disagree with the majority's interpretation of that language.

The charter does contain several broad reservation-of-rights clauses.[20] One of these clauses is found in the first provision of § 8-403.[21] However,

assessments in the absence of statutory authority); *Boekeloo v Hodel,* 828 F2d 727, 732 and ns 4-5 (CA Fed, 1987) ("All authorities agree that the tax 'debt' is not enforceable against a former property owner except as explicitly provided by statute. Michigan provides only for enforcement of real property taxes against the taxed property or the 'debtor's' personal property"); *In re Diamond Reo Trucks, Inc,* 1 Bankr 57, 58 (WD Mich, 1979) (a county could not collect tax deficiencies on real property from a bankrupt lessor that remained after judicial sale); OAG, 1928-1930, pp 426-431 (June 7, 1929).

[19] See *People v Jamieson,* 436 Mich 61, 79; 461 NW2d 884 (1990) ("principles of law deliberately examined and decided by a court of competent jurisdiction become precedent which should not be lightly departed") (opinion of BRICKLEY, J.).

[20] See *ante,* p 691, n 9.

[21] See *ante,* p 686, n 3. The majority states that there is no *express* limitation contained in § 8-403 that would limit plaintiff's tax collecting powers to the judicial sale method found in § 8-403(6). However, tax collection statutes are to be construed against the taxing authority, and they are not to be enlarged by judicial construction. See ns 10

the reservation-of-rights clause that immediately
precedes the judicial sale provision uses the term
"[e]xcept as otherwise provided by this
charter . . . ." In my opinion, the recitation of a
single judicial sale mechanism, and the exclusion
of other methods of tax collection permitted by
state law, constitutes the type of provision contem-
plated by the language of § 8-403(1). In other
words, § 8-403(6) "specifically provides otherwise"
so that the reservation-of-rights clauses are nulli-
fied.

In addition, review of the charter comments
regarding the provisions at issue is highly instruc-
tive. The comments provide, in pertinent part, as
follows:

> In two important respects, however, *Detroit's
> law and procedure is different from, and preferable
> to, the law and procedure of the state.*
> First, there is no counterpart in state law for
> the right granted Detroit property taxpayers to
> pay in 2 installments. Second, *state law permits
> the sale of liens for delinquent property taxes to
> private tax title speculators, often to the great
> prejudice of the owner whose taxes are delinquent.
> Because of the abuses that can result, the Detroit
> treasurer, for some years, has not sold to private
> persons the City's lien for delinquent City real
> property taxes but has collected those taxes him-
> self.* [Final Report of the Detroit Charter Revision
> Commission, Commentary to article 8, § 8-403,
> p 37. Emphasis added.][22]

and 11 and accompanying text. Thus, an express limitation is not
required to find in favor of defendants.

[22] In *Detroit v Safety Investment Corp,* 288 Mich 511; 285 NW 42
(1939), this Court upheld the plaintiff's authority to create the
mechanism of judicial sale to the city under the home rule act. In so
ruling, our brothers noted that the procedure for foreclosure and sale
to the city for unpaid taxes was no different than the provisions of the
General Property Tax Act but for the party initiating the foreclosure
proceedings. *Id.* at 517. Because there was no substantive change in

In this quotation, the charter's revisers made clear the intent to limit plaintiff's tax collecting powers by specifically rejecting one method that was permitted under MCL 211.47; MSA 7.91. This language, which is the only source of concrete evidence of intent *specifically relating to the tax collection provisions,* manifests a singular intent: the limitation of powers otherwise permitted under state law. In light of the fact that the only evidence of intent specifically dealing with the collection of delinquent taxes evinces the desire to limit its power, I cannot agree with the majority that the broad reservation-of-rights clauses permit retroactive application of the in personam action.[23]

The most basic rule of statutory construction[24] is that the intent of the Legislature is to be followed. *Town & Country Dodge, Inc v Treasury Dep't,* 420 Mich 226, 240; 362 NW2d 618 (1984). Of equal importance to this case is the rule that a state may impose a tax only if it is expressly authorized by law. The authority to tax may not be inferred or extended by implication. *Molter v Treasury Dep't,* 443 Mich 537, 543; 505 NW2d 244 (1993); *Michigan Allied Dairy Ass'n v State Bd of Tax Administration,* 302 Mich 643, 650; 5 NW2d 516

the nature of the tax or its collection (except for the authority initiating the action), the provision in the city charter was afforded retroactive application.

The majority quotes from *Safety Investment, supra,* p 516, to highlight the evils of the old taxation system wherein " 'the careless and dishonest did not [pay their taxes].' " See *ante,* p 701. The new system simply secured the payment of taxes with real and personal property. It did not address the possibility of in personam liability. Thus, the evils considered therein and the liberal construction our brothers advocated have no bearing on the issue before us today.

[23] Furthermore, I am disturbed by the majority's failure to adequately explain how the discretion afforded under the home rule cities act permits plaintiff to avoid the general rule that statutes and amendments thereto are to be applied prospectively unless the Legislature provides otherwise.

[24] As the majority properly notes, the rules of statutory construction apply to home rule charters. See *ante,* pp 690-691.

(1942); *In re Dodge Bros,* 241 Mich 665, 669; 217 NW 777 (1928); *Triangle Land Co v Detroit,* 204 Mich 442, 455; 170 NW 549 (1919); 3A Singer, Sutherland Statutory Construction (5th ed), § 66.01, p 1.[25] In addition, ambiguities are to be resolved in favor of the taxpayer. *Dodge Bros, supra.*[26] A specific remedy provided as the proper method of tax collection precludes the use of any other collection method unless specifically provided for. *Bankers Trust Co of Detroit v Russell,* 270 Mich 568, 571-572; 259 NW 328 (1935).[27] Changing the nature of tax collection from in rem to in personam affects substantive rights. See *ante,* pp 707-709. Furthermore, tax collection provisions are to be strictly construed against the taxing authority.[28]

In my opinion, the language of the charter is clear on the point that plaintiff advocated a single method of tax collection and requires affirming the decision of the Court of Appeals. See *Town & Country Dodge, supra.* Even if the intent of the drafters and ratifiers is ambiguous, the great weight of authority requires a construction that favors the taxpayer. See *Molter, Michigan Allied Dairy Ass'n, In re Dodge Bros, Triangle Land Co,* and 3A Singer, Sutherland Statutory Construction, *supra.* Despite the existence of several reservation-of-rights clauses, the charter provides for a single

[25] See ns 10-12 and accompanying text.

[26] For a comprehensive discussion of the due process implications underlying the lien foreclosure process and the need for strict construction of statutes divesting citizens of property to satisfy tax debts, see *Thompson v Auditor General,* n 15 supra.

[27] Before amendment, the rule regarding collection for taxes assessed on personal property was identical. See *Detroit v Jepp,* 52 Mich 458, 459; 18 NW 217 (1884) ("It has always been recognized as the law of this State, that where such a specific remedy is provided in the tax law as the proper method of collection, no suit will lie unless specifically provided for, and then only as so provided").

[28] See n 10.

method collection and obligates courts to construe
it as the exclusive method. *Bankers Trust Co of
Detroit, supra.*[29]

III

A final question that the majority fails to ad-
dress is why plaintiff would forgo the method of
judicial sale provided in charter provision § 8-403
for nearly two decades and at a time when the
real property subject to taxation was worth signifi-
cantly more than the escalating delinquent tax
liability.[30] The fact that the instant lawsuits were
filed *after* the 1987 and 1988 amendments of MCL
211.47; MSA 7.91 appears to indicate that plaintiff
gave no thought to the possibility of an in perso-
nam action pursuant to its discretionary powers
under the home rule cities act[31] until § 47 of the
General Property Tax Act was amended.

---

[29] In *Bankers Trust Co, supra,* p 572, a majority of this Court
recognized only two methods of tax collection provided under the
Detroit City Charter that existed in 1935. These two procedures were
the judicial sale to the city treasurer and the distress and sale of
goods and chattels as provided in 1929 CL 3431, 3438 (distant prede-
cessors to the provisions of the General Property Tax Act that are
involved in this case).

The tone of earlier cases indicates that the tax sale method adopted
by the plaintiff in the earlier part of this century was intended to be
the exclusive method. See, e.g., *O'Connor,* n 15 *supra,* p 533. In fact,
our Court of Appeals concluded that the judicial sale method of
collecting delinquent taxes was the sole method permitted by the
1974 charter and did *not* permit seizure of fire insurance proceeds
even under a lien theory. *Joy Management Co v Detroit,* 176 Mich
App 722, 736; 440 NW2d 654 (1989). I believe that the *Joy Manage-
ment* decision indicates the proper resolution of this issue, and
therefore I do not join in the majority's conclusion that the decision
was incorrect with regard to the analysis of the charter language.

[30] See n 16.

[31] In *Joy Management Co,* n 29 *supra,* the City of Detroit brought a
claim to collect delinquent taxes against the plaintiff for fire insur-
ance proceeds payable to the plaintiff for the destruction of its
property. Although proceedings were filed before the amendment of
MCL 211.47; MSA 7.91, the city claimed a *lien* on the proceeds to
secure the payment of delinquent taxes. There is no indication that
the city asserted in personam liability of the plaintiff in *Joy Manage-
ment.*

I am unaware of any evidence, outside the language of the charter itself, that explains the intent either of the charter's drafters or its ratifiers on the issue whether plaintiff was entitled to utilize in personam methods of tax collection until this option was specifically adopted in the 1991 amendments of the charter. The majority presumes that the broad reservation-of-rights language in the preamble and in other areas of the charter, together with latent policy arguments that are not well defined in the majority's opinion, entitles plaintiff to a judgment in its favor. In contrast, I am aware of another possibility that may explain why the drafters and the ratifiers of the 1974 charter failed to provide for in personam liability.

In the late 1960s and early 1970s, large urban areas experienced an alarming exodus of residents and businesses[32] that eroded their tax bases. Moreover, abandonment of property located within the city limits, and the inherent social evils that are thought to naturally follow, reached crisis levels.[33] The City of Detroit was no exception.[34] It is not outside the realm of possibility that the drafters and ratifiers of the 1974 charter had this in mind when the charter was enacted. The imposition of in personam liability for delinquent taxes, which would allow plaintiff to attach a new set of assets

[32] See, generally, Cisneros, *Interwoven Destinies: Cities and the Nation,* in Interwoven Destinies: Cities and the Nation (New York: Norton & Co, 1993) (Cisneros, ed), pp 20, 25; Ginzberg, *The Changing Urban Scene: 1960-1990 and Beyond,* pp 33-44; Kasarda, *Cities as places where people live and work: Urban change and neighborhood distress,* pp 81-83, 87, 90-91, and the tables that follow.

[33] See, generally, comment, *Property abandonment in Detroit,* 20 Wayne L R 845 (1974), and authorities cited therein. See also Hamilton, *Homesteading urban America after* Moore v Detroit: *The constitutionality of Detroit's nuisance abatement plan and its implications for urban homesteading legislation,* 34 Wayne L R 1609, 1612-1615 (1988).

[34] *Id.*

that includes *intangibles* such as bank accounts
and even wage garnishment for the first time, may
be an attractive method of tax collection today.[35]
However, the hint of this form of liability at the
time when the 1974 charter was enacted could
have had a disastrous effect on continued invest-
ment in real property located within city limits,
which would have taken the form of even more
widespread abandonment than actually occurred.

In the least, the foregoing analysis constitutes a
plausible formulation of the drafters' and ratifiers'
intent where there is little else to guide us. The
fact that the ratifiers specifically abdicated one
state right to protect real property owners, i.e., the
right to sell land to title speculators, underscores
the validity of this point. Thus, it is not possible to
validly claim that the ratifiers' intent on this
narrow question, as evidenced by the language of
§ 8-403, only permits a single conclusion: that
plaintiff had not only the authority to reserve such
a right, but also that it clearly did so. At best, the
intent that the majority attributes to the charter
provision is ambiguous. Accordingly, construction
against the taxing authority is in order pursuant
to longstanding precedent. See *In re Dodge Bros,
supra;* note 10 and accompanying text, *ante,* p 709.

IV

In conclusion, I cannot agree with the majority
that plaintiff somehow preserved its right to retro-
actively assert in personam liability for delinquent
taxes. I am convinced that the home rule cities act
does not afford this degree of discretion, which
would flout established constitutional principles

---

[35] A ruling in favor of plaintiff under a personal liability theory
would entitle it to collect judgments using any methods available to
the public generally under the laws governing satisfaction of judg-
ments. See MCL 600.6001 *et seq.*; MSA 27A.6001 *et seq.*

and rules of construction. Moreover, I believe that the majority is allowing present concerns and policies to guide its conclusion when the appropriate form of inquiry demands attention to the political and economic climate at the time of the charter's ratification. Accordingly, I conclude that plaintiff is entitled to collect delinquent taxes through a personal action only for taxes assessed after the 1991 amendment of the city charter.

LEVIN and GRIFFIN, JJ., concurred with RILEY, J.